SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
    Including Professional Corporations
ORI KATZ, Cal. Bar No. 209561
okatz@sheppardmullin.com
Four Embarcadero Center, Seventeenth Floor
San Francisco, California 94111
Telephone:    415-434-9100
Facsimile:    415-434-3947
AARON J. MALO, Cal. Bar No. 179985
amalo@sheppardmullin.com
650 Town Center Drive, 4th Floor
Costa Mesa, California 92626-1993
Telephone:    714-513-5100
Facsimile:    714-513-5130
CARREN B. SHULMAN (*admitted in New York*)
cshulman@sheppardmullin.com
30 Rockefeller Plaza
New York, New York 10112
Telephone:    212-653-8700
Facsimile:    212-653-8701

Proposed Attorneys for Debtor

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>MMFX TECHNOLOGIES CORPORATION,<br><br>                  Debtor. | Case No. 8:10-bk-27572<br><br>Chapter 11<br><br>**SUPPLEMENTAL DECLARATION OF MICHAEL POMPAY IN SUPPORT OF DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDER (I) AUTHORIZING POST-PETITION FINANCING AND GRANTING LIENS AND SUPER-PRIORITY CLAIMS, AND (II) PROVIDING RELATED RELIEF**<br><br>Date:  December 16, 2010<br>Time:  3:00 p.m.<br>Place:  United States Bankruptcy Court<br>         411 West Fourth Street<br>         Santa Ana, CA 92701<br>         Courtroom 5D<br>Judge:  Hon. Robert Kwan |

-1-

W02-WEST:3MAW1\403148290.1

I, Michael W. Pompay, declare as follows:

1. I am the President of MMFX Technologies Corporation, a California corporation (the "Debtor"). I am also the Corporate Secretary of Fasteel Corporation, a California corporation ("Fasteel"), and the President of MMFX Steel Corporation of America, a Nevada corporation ("Steel Corp.") (the Debtor, Steel Corp., and Fasteel are referred to collectively in this declaration as the "Debtors"). I am familiar with the Debtors' day-to-day operations, business affairs and books and records. Except as otherwise indicated, all statements in this Supplemental Declaration are based on my personal knowledge, my review of relevant documents or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, review of documents or opinion. I am authorized to submit this Supplemental Declaration on behalf of the Debtors.

2. I submit this Supplemental Declaration in support of the Debtors' Emergency Motion for an Order Authorizing Post-Petition Financing (the "DIP Financing Motion").

3. The Debtors have no free cash available to them. I am hopeful that through discussions between the Debtors' conflicts counsel and Wells Fargo Business Credit, a Division of Wells Fargo Bank, N.A. ("Wells Fargo"), the Debtors will be able to quickly reach a stipulation regarding the use of cash collateral during the course of this case. However, it is uncertain whether such a stipulation will be reached. Regardless of whether a stipulation is reached, I believe that the use of cash collateral alone during the course of this case will be insufficient to fund the Debtors' operations, as shown on the Budget attached to the proposed DIP Credit Agreement. As a result, it is critically important that the Debtors obtain the immediate use of the DIP Financing in order to allow critical items, such as payroll funding and expenditures on product, to be made without disruption. Failure to pay those items will severely disrupt the Debtors' business and cause irreparable harm.

4. The proposed DIP Financing provides for the Debtors to borrow up to $5 million, including initial advances of $1.5 million pursuant to an agreed upon budget in the form attached to the DIP Credit Agreement as Exhibit A (the "Budget").

5. The proposed lender, Lindsey Davidson ("DIP Lender"), is currently a party to two pre-petition loan agreements: (i) that certain 12% secured note, dated August 1, 2010 in the original principal amount of $400,000, and (ii) that certain 12% secured note dated October and November 2009 in the original principal of amount of $500,000, DIP Lender's portion of which is $50,000, which loans are secured by certain of the Debtors' inventory and equipment, and pursuant to which DIP Lender is entitled to monthly payments of $4,500.00 for interest (the "Existing Loan").

6. DIP Lender is a shareholder of Technologies, holding 2.97% of the common shares of Technologies. DIP Lender is not, and never has been, an officer, director or person in control of any of the Debtors.

7. Importantly, although the Budget shows beginning cash of $344,224 and accounts receivable of $88,347 during the first week of the case, these amounts are subject to the security interest of Wells Fargo and may not be available during the course of this case. Accordingly, it is absolutely critical that the DIP Financing sought be approved.

8. The Debtors' success in these bankruptcy cases depends in part on the Debtors' ability to successfully recapitalize and reorganize during the course of this case, which in turn depends on its ability to demonstrate to existing and potential customers, suppliers, vendors, employees and other contract counter-parties that the Debtors have adequate means to operate during these chapter 11 bankruptcy cases. It is imperative that the Debtors can promptly instill confidence in the third-parties deeply entwined and relied upon for the Debtors' operations. The Budget is built on assumptions for continued sales and operations. The Debtors purchase product for resale from third-party mills and rely on our existing financial arrangements and supply chain to generate operating cash flow. Unless the interim financing becomes available as set forth in the Budget, the Debtors will suffer irreparable harm as it will be at risk of not meeting their critical obligations to third

1 | parties. Such a failure would in turn force the Debtors to cease operations and liquidate
2 | immediately.
3 |     9.    The DIP Financing is also necessary to avoid the perception by third parties
4 | that they hold undue leverage over the Debtors in normal business negotiations due to the
5 | Debtors' liquidity crisis.
6 |     10.    The ability of the Debtors to obtain sufficient working capital and liquidity
7 | through the incurrence of new indebtedness is vital to the Debtors. The preservation and
8 | maintenance of the going concern value of the Debtors is integral to a successful
9 | reorganization or other transaction.
10 |     11.    The Debtors were unable to obtain unsecured credit from other sources,
11 | despite extensive negotiations with third parties over an extended period of time. As a
12 | result, efforts were focused on obtaining the DIP Financing currently sought. The DIP
13 | Financing offered by the DIP Lender is the Debtors' only realistic alternative to obtain
14 | post-petition credit.
15 |     12.    The Debtors negotiated the DIP Credit Agreement at arm's length and
16 | pursuant to its business judgment.

I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. Executed this 14th day of December 2010 at Irvine, California.

_____
Michael W. Pompay

W02-WEST:3MAW1\403148290.1